## UNITED STATES v. LA ROQUE.

(Circuit Court of Appeals, Eighth Circuit. July 8, 1912.)

### No. 3,698.

1. INDIANS (§ 18*)—LANDS—DEATH OF INDIAN BEFORE ALLOTMENT.

Where an Indian, whose name appeared on the rolls of the Chippewas residing on the White Earth reservation in Minnesota, made under Nelson Act Jan. 14, 1889, c. 24, 25 Stat. 642, died, not having received his allotment, there was no right to an allotment in his name, and a trust patent issued for such an allotment on an application made after his death is void.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 49; Dec. Dig. § 18.*]

2. INDIANS (§ 13*)—LANDS—CANCELLATION OF PATENT—SUIT BY UNITED STATES.

The United States may maintain a suit for the cancellation of a trust patent to an Indian allotment issued without authority of law.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.*]

3. INDIANS (§ 13*)—SUIT FOR CANCELLATION OF TRUST PATENTS—LIMITATION.

Act March 3, 1891, c. 561, § 8, 26 Stat. 1099 (U. S. Comp. St. 1901, p. 1521), which limits the time within which the United States may bring suits to annul land patents to six years from the date of issuance, does not apply to so-called trust patents for Indian allotments, under Act Feb. 8, 1887, c. 119, 24 Stat. 388.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4.** Indians (§ 13*)—Suit for Cancellation of Trust Patent—Right of United States to Maintain.

    Act April 23, 1904, c. 1489, 33 Stat. 297, which authorizes the Secretary of the Interior to correct errors in or cancel Indian trust patents in certain cases at any time during the trust period, does not affect the jurisdiction of the courts to entertain a suit by the United States to cancel such a patent on any well-recognized ground.

    [Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.*]

Appeal from the Circuit Court of the United States for the District of Minnesota.

Suit in equity by the United States against Henry La Roque. Decree for defendant, and complainant appeals. Reversed.

Charles C. Houpt, U. S. Atty.

R. J. Powell (J. T. Van Metre, on the brief), for appellee.

Before ADAMS and SMITH, Circuit Judges, and WILLARD, District Judge.

WILLARD, District Judge. The bill in this case was filed by the United States to set aside an Indian trust patent issued in the name of Vincent La Roque.

[1] The case was tried upon an agreed statement of facts, from which it appears that the defendant, Henry La Roque, is the father of Vincent La Roque; that his mother is dead; that both father and mother were Chippewa Indians, residing on the White Earth reservation in Minnesota; that Vincent La Roque's name appeared on the census made under the provisions of the act of January 14, 1889, known as the "Nelson Act" (25 Stat. 642, c. 24); that an application for an allotment under this act was made in his name; that he was not then alive; that after his death an allotment was made in his name, and on July 21, 1902, a trust patent was issued in his name under the provisions of section 5 of the act of February 8, 1887 (24 Stat. 388, c. 119), for the land allotted, which is a part of the White Earth reservation; and that the defendant, the father, claims to own the land described in the trust patent as the sole heir · of his son Vincent. Upon final hearing a decree was entered dismissing the bill.

There is nothing in the Nelson Act to indicate that lands should be allotted to Indians who died before the allotment was made. The act of 1887 and the act of February 28, 1891 (26 Stat. 794, c. 383), provide for an allotment to each Indian "located" on the reservation. The Supreme Court in Fairbanks v. United States, 223 U. S. 215, 32 Sup. Ct. 292, 56 L. Ed. 409, affirming the judgment of this court in United States v. Fairbanks, 171 Fed. 337, 96 C. C. A. 229, held that Indians born after the Nelson Act was passed were entitled to its benefits. Speaking of the word "located" it said:

    "By such amendment the classification found in the act of February 8, 1887, is entirely omitted, and the language is: 'To each Indian located thereon one-eighth of a section of land.' The conclusion that plaintiffs in error draw from that provision is that being on the reservation at the instant of

time the act was passed is a necessary condition. But such conclusion misses the meaning of the word 'located.' Of itself it has no reference to time. It has reference entirely to place and is used to designate upon what Indians the powers given by the act, when exercised, should operate—that is, 'to each Indian located' on the reservation. The act was a part of a scheme of legislation to have existence and continuity of action until its purpose should be completely fulfilled. See Oakes v. United States, 172 Fed. 305 [97 C. C. A. 139]."

When the powers given by this act "were exercised" with reference to Vincent La Roque he was not alive. In Woodbury v. United States, 170 Fed. 302, 95 C. C. A. 498, it appeared that after the passage of the act of April 28, 1904 (33 Stat. 539, c. 1786), known as the "Steenerson Act," Woodbury made an application for an allotment thereunder, but died soon after. That act declared that the President was authorized to make an allotment to each Indian *now* legally residing on the reservation. This court held that the heirs of Woodbury were not entitled to an allotment. It said:

"Until the allotment was made, Woodbury's right was personal—a mere float—giving him no right to any specific property. This right, from its nature, would not descend to his heirs. They, as members of the tribe, were severally entitled to their allotments in their own right. To grant them the right of their ancestors, in addition to their personal rights, would give them an unfair share of the tribal lands. The motive underlying such statutes forbids such a construction."

Neither at the time the allotment was made nor at the time the trust patent was issued did Vincent La Roque or his heirs have any right to the land described therein.

This trust patent, having been issued to a person not in being, is void. Moffat v. United States, 112 U. S. 24, 31, 5 Sup. Ct. 10, 14 (28 L. Ed. 623). The court in that case said:

"The patents, being issued to fictitious parties, could not transfer the title, and no one could derive any right under a conveyance in the name of the supposed patentees. A patent to a fictitious person is, in legal effect, no more than a declaration that the government thereby conveys the property to no one."

[2] The government can maintain the suit. Heckman v. United States (April 1, 1912) 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820, affirming the decision of this court in United States v. Allen, 179 Fed. 13, 103 C. C. A. 1.

[3] The defendant, however, relies on the statute of limitations contained in Act March 3, 1891, c. 561, 26 Stat. 1095 (U. S. Comp. St. 1901, p. 1521). The trust patent was issued on July 21, 1902. The bill in this case was filed on May 1, 1909. Section 8 of the act of March 3, 1891, is as follows:

"Section 8. That suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents."

The act itself treated of a variety of subjects connected with the public lands. It repealed the timber culture and the pre-emption acts, amended the homestead law, and amended the law relating to

the sale of desert lands. There was no reference in it to Indian lands, except in section 10, which is as follows:

"That nothing in this act shall change, repeal, or modify any agreements or treaties made with any Indian tribes for the disposal of their lands, or of land ceded to the United States to be disposed of for the benefit of such tribes, and the proceeds thereof to be placed in the treasury of the United States; and the disposition of such lands shall continue in accordance with the provisions of such treaties or agreements, except as provided in section 5 of this act."

It is not necessary to consider the effect of this section, any further than to say that it cannot strengthen the claim of the defendant.

Does the word "patent," as used in section 8, cover such a document as was issued by the government in this case? In United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532, the court, speaking of trust patents issued under the allotment act of 1887, said:

"The 'patents' here referred to (although that word has various meanings) were, as the statute plainly imports, nothing more than instruments or memoranda in writing, designed to show that for a period of 25 years the United States would hold the land allotted in trust for the sole use and benefit of the allottee, or, in case of his death, of his heirs, and subsequently, at the expiration of that period—unless the time was extended by the President—convey the fee, discharged of the trust, and free of all charge or incumbrance. In other words, the United States retained the legal title, giving the Indian allottee a paper or writing, improperly called a 'patent,' showing that at a particular time in the future, unless it was extended by the President, he would be entitled to a regular patent conveying the fee."

The court referred to the enabling act of South Dakota, which, after providing that its Constitution should contain certain declarations relating to the Indians, declared that nothing therein provided should preclude the state from taxing lands held and owned by an Indian who had obtained from the United States title thereto by patent or other grant. It then said:

"The patent or grant here referred to is the final patent or grant which invests the patentee or grantee with the title in fee; that is, with absolute ownership. No such patent or grant has been issued to these Indians."

In the case of a true land patent the negotiations and dealings between the government and the patentee are at an end when the patent is issued. But in cases like the one here in question the relations between the government and the Indian are not terminated when the trust patent is issued. The United States still holds the legal title, and it does not lose its interest in the land until the expiration of the trust period. So long as this relation continues there seems to be no reason why any limitations should be placed upon its power to enforce in the courts any rights which it may have.

It should also be considered that, in the case of an ordinary land patent, no one but the government and the patentee are interested. If the patent is set aside, the government becomes again the real owner of the property. In the case of Indian lands, this is not true. Although the legal title is in the government, yet the Indians are in a way the beneficial owners of the property. It is the duty of the gov-

ernment to distribute the land among the Indians entitled thereto. If the patent in this case is set aside, the government will not become the actual owner of the land; but it will be its duty to allot it to some other Indian. Its power to perform its duty in this respect should not be limited, at least during the trust period.

It is also to be observed that by the act of April 23, 1904 (33 Stat. 297, c. 1489), presently to be mentioned, the Secretary of the Interior is given power during the whole of the trust period to cancel the trust patent under certain conditions. It would seem strange, indeed, to limit the power of the courts with reference to such patents to six years, when a similar power is given to an administrative officer for 25 years. The defense based upon this statute of limitations cannot prevail.

[4] The defendant relies also upon the act of April 23, 1904 (33 Stat. 297). That act provides as follows:

"That the act of Congress approved January twenty-sixth, eighteen hundred and ninety-five (Twenty-Eighth Statutes, six hundred and forty-one), entitled 'An act authorizing the Secretary of the Interior to correct errors where double allotments of land have erroneously been made to an Indian, to correct errors in patents, and for other purposes,' be, and the same is hereby, amended to read as follows:

" 'That in all cases where it shall appear that a double allotment of land has heretofore been, or shall hereafter be, wrongfully or erroneously made by the Secretary of the Interior to any Indian by an assumed name or otherwise, or where a mistake has been or shall be made in the description of the land inserted in any patent, said Secretary is hereby authorized and directed, during the time that the United States may hold the title to the land in trust for any such Indian, and for which a conditional patent may have been issued, to rectify and correct such mistakes and cancel any patent which may have been thus erroneously and wrongfully issued whenever in his opinion the same ought to be canceled for error in the issue thereof, and if possession of the original patent can not be obtained, such cancellation shall be effective if made upon the records of the General Land Office; and no proclamation shall be necessary to open to settlement the lands to which such an erroneous allotment patent has been canceled, provided such lands would otherwise be subject to entry: And provided, that such lands shall not be open to settlement for sixty days after such cancellation: And further provided, that no conditional patent that shall have heretofore or that may hereafter be executed in favor of any Indian allottee, excepting in cases hereinbefore authorized, and excepting in cases where the conditional patent is relinquished by the patentee or his heirs to take another allotment, shall be subject to cancellation without authority of Congress.' "

The act which it amended (Act Jan. 26, 1895, c. 50, 28 Stat. 641), is as follows:

"That in all cases where it shall appear that a double allotment of land has heretofore been, or shall hereafter be, wrongfully or erroneously made by the Secretary of the Interior to any Indian by an assumed name or otherwise, or where a mistake has been or shall be made in the description of the land inserted in any patent, said Secretary is hereby authorized and directed, during the time that the United States may hold the title to the land in trust for any such Indian and for which a conditional patent may have been issued, to rectify and correct such mistakes and cancel any patent which may have been erroneously and wrongfully issued, whenever in his opinion the same ought to be canceled for error in the issue thereof, or for the best interests of the Indian, and, if possession of the original patent cannot be obtained, such cancellation shall be effective if made upon the records of the General Land Office and no proclamation shall be necessary to open the lands so allotted to settlement."

A comparison of these laws shows that the former was intended to limit the power of the Secretary to cases specifically mentioned therein, and not to allow him to cancel any trust patent whenever he thought it ought to be canceled for the best interests of the Indian, a power which perhaps was given to him by the act of 1895.

Neither act deals in any way with the power of the courts. It cannot be assumed that Congress intended to give to the Secretary power to cancel a trust patent for certain reasons at any time within 25 years, and at the same time to take away from the courts the power to entertain a suit by the government to cancel a patent on any of the grounds then well recognized as being sufficient to move the courts to action. If the contention of the defendant be sustained then the government cannot maintain an action to set aside a trust patent for fraud. Under the act of 1904 the Secretary has no power to set aside such patent. The only remedy in such a case therefore would be an appeal to Congress. This result never could have been intended.

The decree of the court below is reversed, and the case remanded, with instructions to enter a decree as prayed for in the bill, with the exception, however, that the decree shall provide that the government holds the land in the same way in which it held it before the patent was issued.

SMITH, Circuit Judge, concurs in the result.